UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                            Case No. 24-47922

HERITAGE COLLEGIATE APPAREL, INC.,                Chapter 11

                                                  Judge Thomas J. Tucker
                    Debtor.
_____/

HERITAGE COLLEGIATE APPAREL, INC.,

                    Plaintiff,

v.                                                Adv. No. 25-4146

ELEMENTAL CAPITAL, INC., and
REDSTONE ADVANCE, INC.,

                    Defendants.
_____/

**OPINION AND ORDER GRANTING, IN PART, DEFENDANTS' JOINT MOTION TO
DISMISS COUNTS III, VI, VII, AND VIII OF PLAINTIFF'S AMENDED COMPLAINT**

**A. Introduction**

This adversary proceeding presents a dispute between the Plaintiff, a Chapter 11

bankruptcy debtor, and two Defendants that provided financing to the Debtor pre-petition, under

what are commonly known as merchant cash advance agreements.

Now before the Court is the Defendants' joint motion entitled "Defendants' Partial

Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" (Docket # 22, the "Motion"). The

Plaintiff filed a response objecting to the Motion (Docket # 24). The Defendants then filed a

joint reply brief (Docket # 27). The Court held a hearing on the Motion on December 17, 2025,

and took the Motion under advisement.

For the reasons stated below, the Court will grant the Defendants' Motion in part.

## B. Background

The Motion seeks dismissal of four of the counts in the Plaintiff's eight-count amended complaint (Docket # 15, the "Amended Complaint"), namely, Counts III, VI, VII, and VIII. These counts concern two agreements the Plaintiff made with the Defendants, namely, (1) the agreement dated and effective June 14, 2023 that the Plaintiff made with Defendant Redstone Advance, Inc. ("Redstone"), entitled "Sale of Future Receipts Agreement" (the "Redstone Agreement"); and (2) the agreement dated and effective December 6, 2023 that the Plaintiff made with Defendant Elemental Capital, Inc. ("Elemental"), entitled "Sale of Future Receipts Agreement" (the "Elemental Agreement").[1] The agreements are complex. The Court will describe the features of these agreements that are relevant to the present Motion.

### 1. The Redstone Agreement

According to the Redstone Agreement, Redstone purchased $899,400.00 of the Plaintiff's "Future Receipts," for a purchase price of $600,000.00.[2] The agreement defined "Future Receipts" as "the proceeds of each future sale made by [the Plaintiff]" and "all payments made . . . in the ordinary course of [the Plaintiff's] business."[3] In exchange for the purchase price, the Plaintiff gave Redstone access to its bank account, and permitted Redstone to debit that bank account in the amount of $15,000.00 each business day, until the $899,400.00 in Future Receipts

---

[1] Copies of these agreements are attached to the Plaintiff's Amended Complaint (Docket # 15), as Exhibit A (Redstone Agreement) and Exhibit B (Elemental Agreement), among other places in the record.

[2] *See* Redstone Agreement at 1 (Docket # 15, Ex. A, at pdf p. 31).

[3] *See id.* at 1, 2 ¶ 1 (Docket # 15, Ex. A, at pdf pp. 31, 32 ¶ 1).

2

was paid to Redstone. The $15,000.00 daily payment amount was stated to be an estimated 35% of the Plaintiff's average daily sales revenue.[4]

The Redstone Agreement stated that the transaction was not a loan, but rather a sale of future receipts. For example, paragraph 5 of the "Terms and Conditions" in the agreement stated, in part:

> **5. Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** [Plaintiff] is selling a portion of a future revenue stream to [Redstone] at a discount, not borrowing money from [Redstone]. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [Redstone]. . . . By this Agreement, [Plaintiff] transfers to [Redstone] full and complete ownership of the Purchased Amount of Future Receipts and [Plaintiff] retains no legal or equitable interest therein.[5]

In paragraph 14 of the "Terms and Conditions," while reiterating that the transaction was a true sale, the Redstone Agreement also stated, conditionally, that it constituted a security agreement, that Redstone had all the rights of a secured party, and that Redstone was authorized to file a UCC-1 financing statement.[6] Paragraph 14.a stated, in part:

> **Acknowledgment of Security Interest and Security Agreement.** The Future Receipts sold by [the Plaintiff] to [Redstone] pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from [the Plaintiff] to [Redstone]. To the

---

[4] *See id.* at 1 (Docket # 15, Ex. A, at pdf p. 31). 35% was defined as the "Specified Percentage." *Id.* The Redstone Agreement stated that at any time, the Plaintiff or Redstone could request that the daily payment amount be adjusted "to more closely reflect the [Plaintiff's] actual Future Receipts times the Specified Percentage." *See id.* at 1, 2 ¶ 4 (Docket # 15, Ex. A, at pdf pp. 31, 32 ¶ 4).

[5] *Id.* at 2 ¶ 5 (Docket # 15, Ex. A, at pdf p. 32 ¶ 5) (bold and capitalization in original).

[6] *See id.* at 4 ¶¶ 14.a, 14.b (Docket # 15, Ex. A, at pdf p. 34 ¶¶ 14.a, 14.b).

3

extent the Future Receipts are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the [Plaintiff] is located ("UCC") then: (i) the sale of the Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) [Redstone] has all the rights of a secured party under the UCC with respect to such Future Receipts.[7]

The Plaintiff's Amended Complaint alleges that over time, the Plaintiff paid Redstone the full amount of the Future Receipts sold to Redstone, and in fact, that the Plaintiff paid Redstone much more than that amount.[8]

## 2. The Elemental Agreement

Roughly six months after making the Redstone Agreement, the Plaintiff entered into the Elemental Agreement with Elemental, effective December 6, 2023. As discussed in Part D.3 of this Opinion, below, the Plaintiff alleges that Elemental was an "alter ego" of Redstone.

According to the Elemental Agreement, Elemental purchased $5,425,000.00 of the Plaintiff's "Future Receipts," for a purchase price of $3,550,000.00.[9] The agreement was in the same form as the Redstone Agreement, and also defined "Future Receipts" as "the proceeds of each future sale made by [the Plaintiff]" and "all payments made . . . in the ordinary course of [the Plaintiff's] business."[10] In exchange for the purchase price, the Plaintiff gave Elemental access to its bank account, and permitted Elemental to debit that bank account in the amount of

---

[7] *Id.* at 4 ¶ 14.a (Docket # 15, Ex. A, at pdf p. 34 ¶ 14.a) (bold in original).

[8] *See, e.g.,* Amended Complaint (Docket # 15) at ¶¶ 25, 28.

[9] *See* Elemental Agreement at 1 (Docket # 15, Ex. B at pdf p. 41).

[10] *See id.* at 1, 2 ¶ 1 (Docket # 15, Ex. B at pdf pp. 42, 43 ¶ 1).

4

$70,000.00 each business day, until the $5,425,000.00 in Future Receipts had been paid to Elemental. The $70,000.00 daily payment amount was stated to be an estimated 40% of the Plaintiff's average daily sales revenue.[11]

Like the Redstone Agreement, the Elemental Agreement stated that the transaction was not a loan, but rather a sale of future receipts. It contained the same paragraph 5 "**THIS IS NOT A LOAN**" language that the Redstone Agreement did, quoted above.[12] It also contained the same paragraph 14 security interest language that the Redstone Agreement did, quoted above.[13]

The Elemental Agreement stated that of the $3,550,000.00 purchase price, Elemental paid $2,656,546.00 to Redstone.[14] After deducting from the purchase price that amount, plus a $50.00 "wire fee" and a $493,404.00 "Origination Fee," the Agreement stated, the "Net Amount Funded to [the Plaintiff]" was $400,000.00.[15]

### 3. Elemental's proof of claim

---

[11] *See id.* at 1 (Docket # 15, Ex. B at pdf p. 41). 40% was defined as the "Specified Percentage." *Id.* As with the Redstone Agreement, the Elemental Agreement stated that at any time, the Plaintiff or Elemental could request that the daily payment amount be adjusted "to more closely reflect the [Plaintiff's] actual Future Receipts times the Specified Percentage." *See id.* at 1, 2 ¶ 4 (Docket # 15, Ex. B at pdf pp. 41, 43 ¶ 4).

[12] *See* Elemental Agreement at 2 ¶ 5 (Docket # 15, Ex. B at pdf p. 43 ¶ 5) (bold and capitalization in original).

[13] *See id.* at 4 ¶¶ 14.a, 14.b (Docket # 15, Ex. B at pdf p. 45 ¶¶ 14.a, 14.b).

[14] *See id.* at 1 (Docket # 15, Ex. B at pdf p. 41); *see also* "Addendum to Standard Sale of Future Receipts Agreement" (Docket # 15, Ex. B at pdf p. 42) (instructing Elemental to pay "up to $2,656,546.00 of the Purchase Price" to Redstone, and to pay "up to $400,000.00 of the Purchase Price" to CC Products LLC). CC Products LLC was one of the Plaintiff's vendors, and the Plaintiff agrees that the $400,000.00 was paid to that vendor "on the [Plaintiff's] behalf." *See* Amended Complaint (Docket # 15) at ¶ 33.

[15] *See* Elemental Agreement at 1 (Docket # 15, Ex. B at pdf p. 41).

5

Redstone did not file a proof of claim in the Plaintiff's bankruptcy case, and there appears to be no dispute that the Plaintiff Debtor owes nothing to Redstone. (In fact, as noted above, the Plaintiff alleges that Redstone was overpaid).

Elemental timely filed a proof of claim in the bankruptcy case,[16] in the amount of $4,596,132.00.[17] As the basis of that claim, Elemental alleged "Sale of Future Receipts/ Ownership Interest in Future Receipts" and "Breach of Purchase Agreement."[18] The claim also stated that Elemental's claim is "secured by a lien on property" with a value in the full amount of the claim, namely, "Accounts/Proceeds of Accounts/Purchased Accounts" and "Purchased Future Receipts," and that the lien is perfected by a "UCC Financing Statement; UCC 9-309."[19]

In a "Rider" attached to its proof of claim, Elemental alleged that under the Elemental Agreement, Elemental purchased $5,425,000 of Future Receipts from the Plaintiff, and that the

---

[16] Although it is titled "Proof of Claim" on the first page, consistent with Elemental having used Official Form 410, Elemental's claim is a "Claim of Ownership" as that phrase is used in the Court's bar date order filed in the main case on November 4, 2024 (Docket # 184 in Case No. 24-47922). That Order set a deadline of November 29, 2024 for filing a Claim of Ownership. *Id.* at 2. The deadline for filing other claims was March 17, 2025 for governmental units and December 16, 2024 for creditors other than governmental units. *See* Notice of Chapter 11 Bankruptcy Case (Docket # 14 in Case No. 24-47922) at 2 ¶ 7.

[17] Claim No. 66-1, filed November 29, 2024 in Case No. 24-47922, at 2. In this Opinion, the Court describes the filing and content of certain documents that were filed in the Plaintiff's bankruptcy case, including Elemental's proof of claim and the Plaintiff's confirmed liquidation plan. The Court may take judicial notice of these filings, and may consider them in ruling on the Defendants' Motion. *See Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) ("[T]he court may, in undertaking a [Rule] 12(b)(6) analysis, take judicial notice of 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.' *Golf Vill. North, LLC v. City of Powell*, 14 F.4th 611, 617 (6th Cir. 2021) (quoting *Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020)).").

[18] Claim No. 66-1, filed November 29, 2024 in Case No. 24-47922, at 2.

[19] *Id.*

transaction was a true sale, not a loan, such that the purchased Future Receipts are owned by Elemental, rather than the Plaintiff or the bankruptcy estate.[20] The Rider further stated, in relevant part,

> Elemental contends that . . . it is not a creditor, and the [Elemental] Agreement does not give rise to a debt that is even subject to reorganization unless and until the Court determines that the transaction between the Debtor and Elemental is not a true sale, which determination requires an adversary [proceeding] pursuant to Fed. R. Bankr. P. 7001(2). [citations omitted]. . . Elemental is filing a claim . . . to preserve its rights in the event the Court were to find the transaction is not a true sale.[21]

### 4. The funds being held under the confirmed plan of liquidation in the Plaintiff's bankruptcy case

The parties' dispute about Elemental's claim matters, because under the Plaintiff's confirmed Chapter 11 liquidation plan, the Plaintiff is holding enough in funds to pay up to the full amount of Elemental's claim, if and to the extent Elemental prevails in this adversary proceeding. The Plaintiff's confirmed liquidation plan is complicated. The Court will describe the features of the plan that are relevant here, plus other relevant background.

As the Plaintiff's Amended Complaint alleges, for many years before filing this bankruptcy case, the Plaintiff "sold University of Michigan branded clothing and other merchandise to retail customers through several brick and mortar and online outlets."[22] The Plaintiff was formerly named "M-Den, Inc.," and did business using the trade name "The M

---

[20] *See id.*, part 4 (Rider) at 1-2.

[21] *Id.* at 3. Elemental cited Bankruptcy Rule 7001(2), but that rule is now Fed. R. Bankr. P. 7001(b).

[22] Amended Complaint (Docket # 15) at ¶ 9.

Den."  Beginning in 2020, and in part because of the COVID pandemic, the Plaintiff began having significant financial problems,[23] which ultimately led to the Plaintiff filing its voluntary Chapter 11 bankruptcy petition on August 16, 2024.

The Plaintiff quickly sought and obtained authority from this Court to sell substantially all of its assets, on an expedited basis.  After holding an auction sale, the Plaintiff obtained the Court's approval to sell its assets to the winning bidder, Rally House, Inc., for a total purchase price of $11,613,877 (the "Sale Proceeds").  The sale closed on September 24, 2024.[24]

The Plaintiff alleges that "[t]he Sale Proceeds were allocated as follows: (i) $3,863,877 to the Debtor's inventory, and (ii) $7,750,000 to the Debtor's remaining assets, which primarily included leasehold interests and goodwill."[25]

As ordered by this Court, the Plaintiff's assets were sold "free and clear of all liens, claims, encumbrances and interests of any kind[,]" with such interests transferred to the Sale Proceeds.[26]

Ultimately, on June 10, 2025, the Plaintiff obtained confirmation of a plan of liquidation (the "Plan").[27]  As the Plan described, there were six secured creditors claiming a lien in the Sale Proceeds, plus three merchant cash advance creditors (the "MCA Creditors") claiming to own

[23] *See id.* at ¶ 15.

[24] *See id.* at ¶¶ 79-82.  The Order approving the sale was entered on September 20, 2024 (Docket # 142 in Case No. 24-47922) (the "Sale Order").

[25] Amended Complaint (Docket # 15) at ¶ 83.

[26] *See id.* at ¶ 84; *see also* Sale Order (Docket # 142 in Case No. 24-47922) at 21 ¶ 15.

[27] The confirmation order was entered on June 10, 2025 (Docket # 296 in Case No. 24-47922). It confirmed, with modifications not relevant here, the Plaintiff's Fourth Amended Plan of Liquidation (the "Plan") (Docket # 275 in Case No. 24-47922).

8

part of the Sale Proceeds.[28]  The three MCA Creditors, and their filed claim amounts, were (1) Elemental, $4,596,132; (2) Vault 26 Capital, LLC, $860,700; and (3) Family Funding Group, LLC, $380,000.[29]

Under the Plan, the Plaintiff was required to hold back from distributions to creditors a total of $5,836,832 of the Sale Proceeds, which equaled the total amount of the claims filed by the three MCA Creditors.  The hold-back was to last until the outcome of adversary proceedings to be filed by the Plaintiff against the MCA Creditors.  As the Plan says, the Plaintiff intended to seek a determination whether the MCA Creditors owned or had a valid lien in the Sale Proceeds.  To the extent the Plaintiff succeeded in eliminating or reducing any MCA Creditor's claim that it owns or has a lien in the Sale Proceeds, that would free up part of the held-back funds, and permit that amount to be distributed to one or more of the secured creditors with allowed claims, according to their priority.[30]

This adversary proceeding is one of the three filed by the Plaintiff against these MCA Creditors.  The others are Adv. No. 25-4148, against Vault 26 Capital, LLC, which remains pending; and Adv. No. 25-4147, against Family Funding Group, LLC, which concluded with a default judgment against Family Funding Group, LLC.  In that default judgment, entered on September 18, 2025, among other things, this Court determined that Family Funding Group, LLC

---

[28]  *See* Plan (Docket # 275 in Case No. 24-47922) at 7-8.

[29]  *See id.* at 8; Claim No. 67-1 filed in Case No. 24-47922 (proof of claim filed by Vault Capital); Claim No. 65-1 filed in Case No. 24-47922 (proof of claim filed by Family Funding Group, LLC).

[30]  *See* Plan (Docket # 275 in Case No. 24-47922) at 8-9.

has neither an ownership interest nor a security interest in the Sale Proceeds.[31]

## C. Standards governing Rule 12(b)(6) motions

In deciding the Motion, the Court has applied the standards it has previously held to be applicable to motions under Fed. R. Civ. P. 12(b)(6), which applies in this adversary proceeding under Fed. R. Bankr. P. 7012(b). Those standards were described in detail in this Court's opinion in *Wahrman v. Bajas* (*In re Bajas*), 443 B.R. 768, 770-72 (Bankr. E.D. Mich. 2011), and the Court incorporates by reference what it said in that opinion about the Rule 12(b)(6) standards.

## D. Discussion

The Court will discuss each of the Amended Complaint counts which the Motion seeks to dismiss.

### 1. Counts VI and VII

Initially, Count VI and Count VII of the Amended Complaint will be discussed together. Count VI is intended to support Counts VII and VIII of the Amended Complaint, and possibly other counts not covered by the present Motion. Count VI seeks a declaration that the Redstone Agreement and the Elemental Agreement are "loan transactions," and therefore are "subject to the laws applicable to loans, including usury laws."[32] Count VII notes that these agreements both state that New York law governs, and alleges that these "[d]isguised [l]oan [a]greements" are void and unenforceable under New York law. This is so, Count VII alleges, because the agreements both charge disguised interest at a rate much higher than the maximum permitted by

---

[31] Docket # 11 in Adv. No. 25-4147.

[32] *See* Amended Complaint (Docket # 15) at ¶ 138, and 25 ("Wherefore" clause).

10

New York's criminal usury statute, which is 25% per annum.[33]  *See* NY CLS Penal § 190.40.

Count VII seeks the following relief:

> judgment in favor of [the Plaintiff] finding that: (i) the Disguised
> Loan Agreements are usurious, (ii) Redstone and Elemental are
> prohibited from collecting from [the Plaintiff] any amount that
> exceeds the amount it disbursed to [the Plaintiff], and (iii) [the
> Plaintiff] is entitled to all its other remedies.[34]

The Defendants argue that Counts VI and VII must be dismissed, because they each seek affirmative relief of a form that is not permitted under New York's usury laws.

New York has both a civil usury statute, N.Y. Gen. Oblig. Law § 5-501, and a criminal usury statute, NY CLS Penal § 190.40.  Unlike an individual, a corporation may not "interpose the defense of usury in any action" under the civil usury statute.  But a corporation may interpose such a defense under the criminal usury statute.  *See* N.Y. Gen. Oblig. Law §§ 5-521(1), (3).

Courts have interpreted these statutes to mean that a corporation can assert usury only under the criminal usury statute, and then only as a *defense* to an action seeking repayment of a loan, not as an affirmative claim for relief.  As one court explained,

> The laws of the state of New York prohibit both civil and criminal
> usury.  Corporations, however, cannot assert claims for civil usury.
>
> Corporations can, however, assert criminal usury as a defense. . . .
>
> Corporations are also barred from asserting affirmative claims for
> criminal usury; rather, they are limited to asserting criminal usury
> only as a defense to repayment.  *See* N.Y. Gen. Oblig. Law
> § 5–521(3) (creating an exception to subsection (1) by permitting
> corporations to "interpose[] a *defense* of criminal usury as
> described in section 190.40 of the penal law.") (emphasis added).

---

[33]  *Id.* at ¶¶ 140-147.

[34]  *Id.* at 27.

> Consequently, corporations are barred from seeking "affirmative
> monetary relief" under Section 190.40.

*GMI Grp., Inc. v. Unique Funding Sols., LLC* (*In re GMI Grp., Inc.*), 606 B.R. 467, 482 (Bankr.

N.D. Ga. 2019) (some citations omitted).  Some cases have applied this rule strictly.  For

example, cases have held that a corporation may not file an action seeking declaratory relief

based on New York's criminal usury statute.  *E.g., Haymount Urgent Care PC v. GoFund*

*Advance, LLC*, 609 F. Supp. 3d 237, 254 (S.D.N.Y. 2022)*; Streamlined Consultants, Inc. v. EBF*

*Holdings LLC*, No. 21-CV-9528, 2022 WL 4368114, at *3-4 (S.D.N.Y. Sept. 20, 2022).  And

one case held that a debtor could not file an action seeking relief from a cognovit judgment based

on criminal usury.  *See Paycation Travel, Inc. v. Glob. Merch. Cash, Inc.*, 141 N.Y.S. 3d 319,

320  (N.Y. App. Div. 2021).

New York's highest court has held that when a corporation is successful in defending

against a claim for repayment of a loan, based on the criminal usury statute, "the usurious loan

transaction is deemed void and unenforceable, resulting in the uncollectability of both principal

and interest."  *Adar Bays, LLC v. GeneSYS IS, Inc.*, 37 N.Y.3d 320, 325-26 (N.Y. App. Div.

2021).  "[T]he legislature intended for criminally usurious loans made to corporate borrowers to

be void when a successful usury defense, based on the criminal usury rate, is raised."  *Id.* at 333.

*See also Haymount Urgent Care PC*, 609 F. Supp. 3d at 254 ("Where the interest rate exceeds

the criminal usury rate, a corporation may interpose an affirmative defense of usury and, if

successful, obtain a declaration that invalidates the debt instrument ab initio.").

In the bankruptcy context, at least two courts have held that a corporate debtor may object

to a proof of claim on the ground that the claim is based on a loan that violates New York's

criminal usury statute.  Those courts view such a claim objection as defending against a claim for repayment of a loan, so that the claim objection is permitted under New York usury law.  *See GMI Grp., Inc.*, 606 B.R. at 497; *JLK Construction v. EIN Cap, Inc.*, Adv. No. 23-4031 (Bankr. W.D. Mo. June 6, 2024) at 30 n.37.[35]  This Court agrees with those holdings.  And the Defendants have cited no case holding otherwise.

The Plaintiff argues that Counts VI and VII amount to an objection to the proof of claim filed by Elemental, based on the theory that the Elemental Agreement transaction was a disguised loan, not a true sale, and that the loan violated New York's criminal usury statute.  The Defendants argue that these counts say nothing to indicate that they are a claim objection, and should not be viewed as such for that reason.

The Court agrees with the Defendants on this point.  As for Redstone, the Plaintiff's Amended Complaint does not allege that Redstone filed a proof of claim, and as noted above, Redstone in fact did not file a proof of claim.  As a result, there can be no objection to a proof of claim against Redstone.  As for Elemental, the Amended Complaint mentions the fact that Elemental filed a proof of claim, and briefly describes the nature of that claim,[36] but the Amended Complaint fails to plead an objection to that claim that satisfies the pleading requirements of Fed. R. Civ. P. 8(a), which applies in this adversary proceeding under Fed. R. Bankr. P. 7008.  These include the requirement in Civil Rule 8(a)(3) that a claim contain "a demand for the relief sought."  Nowhere in Counts VI or VII, or elsewhere in the Amended

---

[35]  The *JLK Construction* case is unpublished.  It was cited in the Defendants' Motion, and a copy of it is attached to the Motion as an exhibit (Docket # 22-2).

[36]  *See* Amended Complaint (Docket # 15) at ¶ 85.

13

Complaint, is there any statement that the Plaintiff is objecting to Elemental's proof of claim, nor is there any reference to 11 U.S.C. § 502(b), which provides the grounds for objecting to a claim. And strictly speaking, the relief sought in Counts VI and VII is both different from, and broader than, the relief the Plaintiff could obtain from a claim objection.

The relief the Plaintiff could obtain from an objection to Elemental's claim is, at most, the partial or entire disallowance of Elemental's claim. Counts VI and VII do not ask for that relief. The relief sought in Count VI is merely a declaratory judgment that the Elemental Agreement and the Redstone Agreement "are loan transaction[s], despite any reference to the contrary, and are subject to laws applicable to loans, including usury laws."[37] The relief sought in Count VII is, as quoted above,

> judgment in favor of [Plaintiff] **finding that: (i) the Disguised Loan Agreements are usurious**, (ii) Redstone and Elemental are prohibited from collecting from [Plaintiff] any amount that exceeds the amount it disbursed to [Plaintiff], and (iii) **[Plaintiff] is entitled to all its other remedies**.[38]

For these reasons, the Court must conclude that Counts VI and VII of the Amended Complaint are different from, and more than, a mere objection to the claim filed by Elemental. And these Counts cannot be considered an objection to any claim filed by Redstone, since Redstone filed no proof of claim. As a result, Count VI (to the extent it is intended to support Count VII) and Count VII fail to state plausible claims against either Elemental or Redstone upon which relief can be granted.

If the foregoing pleading shortcomings were the only problem, it would be fairly easy for

---

[37] *Id.* at 25.

[38] *Id.* at 27 (emphasis added).

14

the Plaintiff to amend its complaint, to limit Count VII to an objection to claim, as to Elemental. (Any such amendment as to Redstone would be futile, because Redstone filed no proof of claim.)

An objection to claim may be brought as part of an adversary proceeding. Elemental does not dispute this, and the point is illustrated by the *GMI Group* case cited above. In that case the Chapter 11 bankruptcy debtor included an objection to claim in a count in its adversary complaint, based on New York's criminal usury law, and the court refused to dismiss that count. *See GMI Grp., Inc.*, 606 B.R. at 497. And the court noted that

> [u]nder 11 U.S.C. § 502(b)(1), a claim may be disallowed where it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]" Accordingly, the Debtor sets forth a plausible basis for objecting to Defendant's claim and seeking its disallowance on the ground that the underlying Agreement is criminally usurious.

*Id.* Moreover, Elemental's own proof of claim stated that under "Fed. R. Bankr. P. 7001(2),"[39] an adversary proceeding would be necessary before the Court could "determine[] that the transaction between the Debtor and Elemental is not a true sale[.]"[40]

The Plaintiff therefore could bring an objection to Elemental's claim as a count in this adversary proceeding, but for the futility problem discussed below. That is so even though the proof of claim Elemental filed claims to *own* part of the Sales Proceeds that the Debtor is holding, and denies that there was any loan that must be repaid. Under the Bankruptcy Code, a "claim" is defined as "a right to payment," *see* 11 U.S.C. § 101(5)(A), and Elemental's proof of

---

[39] Under former Rule 7001(2), which is now Rule 7001(b), an adversary proceeding includes, with exceptions not applicable here, "a proceeding to determine the validity, priority, or extent of a lien or other interest in property. . . ." Fed. R. Bankr. P. 7001(b).

[40] [Elemental] Claim No. 66-1, filed in Case No. 24-47922, part 4 (Rider) at 3.

15

claim asserts that, by virtue of its ownership right, it has a right to a payment of $4,596,132.00 from the Sales Proceeds the Debtor is holding. Under the Bankruptcy Code, a "party in interest" may object to Elemental's claim, *see* 11 U.S.C. § 502(a), and the Plaintiff is such a "party in interest." Indeed, as described in Part B.4 of this Opinion, above, the Plaintiff is *the* party designated by the confirmed Chapter 11 Plan to file adversary proceedings to seek a determination whether Elemental and the other MCA Creditors own or have a valid lien in the Sale Proceeds.

But there is a futility problem with Plaintiff's usury defense against Elemental, under New York law. The Defendants argue that even if the Elemental Agreement were deemed to be a disguised loan transaction, New York's criminal usury statute would not apply, because the alleged loan exceeded $2.5 million. N.Y. Gen. Oblig. Law § 5-501(6)(b) states, in relevant part:

> No law regulating the maximum rate of interest which may be charged, taken or received, including section 190.40 and section 190.42 of the penal law, shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more.

If the Elemental Agreement is viewed as a disguised loan, it is clear from the face of the agreement that the amount of that loan was $3,550,000.00, the amount the agreement stated was "Purchase Price Paid to Seller." The Court agrees with the Defendants that the Elemental Agreement is shielded by the exception to New York's criminal usury statute for loans of $2.5 million or more.

The Plaintiff's arguments to the contrary are unavailing. First, the Plaintiff argues that the Elemental Agreement stated that the transaction was not a loan, and also that it stated that there was no interest. This may be true, but this argument ignores the Plaintiff's own usury

16

theory. That theory is that the Elemental Agreement was for a loan, despite the fact that it said that it was not, and that the amount charged to Plaintiff that exceeded the amount of the loan was disguised interest (in an amount so large as to be usurious), despite what the Elemental Agreement said. The Plaintiff's own usury theory asks the Court to ignore the statements in the Elemental Agreement that the transaction was not a loan and that no interest was being charged. The Court must do that in order to entertain the Plaintiff's usury theory in the first place, and also, therefore, for purposes of determining if the $2.5 million exception to the usury statute applies.

Second, the Plaintiff argues that the $2.5 million exception does not apply because of certain allegations in the Amended Complaint, which the Plaintiff says the Court must accept as true in ruling on the Defendants' Rule 12(b)(6) Motion. The Amended Complaint alleges that the total amount actually advanced by Elemental under the Elemental Agreement was only $400,000, not $3,550,000.00 as stated in the Elemental Agreement.[41]

The Court must reject this argument, because it is clearly refuted by the written Elemental Agreement itself, which was attached to the Amended Complaint as Exhibit B, and which the Plaintiff admits making with Elemental.[42] As described in detail in Part B.2 of this Opinion, above, the Elemental Agreement clearly states that the amount advanced by Elemental to and for the benefit of the Plaintiff was $3,550,000.00. The first page of the Elemental Agreement states that the "Purchase Price **Paid** to Seller" was $3,550,000.00, and clearly defines the "Seller" as

---

[41] *See* Amended Complaint (Docket # 15) at ¶¶ 33, 39, 112.

[42] *Id.* at ¶ 30.

the Plaintiff.[43]  This alone is enough to clearly establish that the allegedly disguised loan was for $3.55 million.  The agreement also states that $2,656,546.00 of this amount took the form of a payment by Elemental to Redstone, which payment the Plaintiff expressly authorized.[44]  The Amended Complaint alleges that this sum was not actually paid to Redstone.[45]  But that allegation, like the allegation that Elemental only actually advanced $400,000.00, also is contradicted by the written Elemental Agreement.

The Court must reject the Plaintiff's allegation that Elemental did not actually advance (or loan, under the Plaintiff's theory) $2.5 million or more, because it is based on facts that are clearly contradicted by the written Elemental Agreement.  The rule in the Sixth Circuit is that in ruling on a motion to dismiss, "'if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached

---

[43]  Elemental Agreement at p. 1 (Docket # 15, Ex. B at pdf p. 41) (emphasis added).

[44]  It does not matter whether, at the time of Elemental's payment of the $2,656,546.00 to Redstone, the Plaintiff owed no money to Redstone, as alleged in ¶ 36 of the Amended Complaint.  Rather, the important point is that Elemental paid this amount to Redstone, as it was authorized and directed to do by the Elemental Agreement that the Plaintiff signed, so this sum was part of the allegedly disguised loan made under the Elemental Agreement.  It is a different question whether Redstone was paid more than it was owed by the Plaintiff, through the Elemental Agreement.  This question may arise under Count V of the Plaintiff's Amended Complaint, for example.  That count alleges a fraudulent transfer claim against Redstone, based on 11 U.S.C. § 544(b) and the Michigan Uniform Voidable Transaction Act.  *See* Amended Complaint at ¶¶ 121-128.  The Defendants' Motion does not seek dismissal of Count V.

Nor does it matter that the Amended Complaint alleges that Redstone and Elemental were "alter egos of one another," Amended Complaint (Docket # 15) at ¶ 37, for at least two reasons.  First, the Court is dismissing the Plaintiff's alter ego claim.  *See* Part D.3 of this Opinion, below.  Second, even if Redstone and Elemental are alter egos, so that Elemental's payment to Redstone was, in effect, a payment to itself, the Elemental Agreement transaction is simply like the situation where a borrower refinances a loan by obtaining a new loan from its original lender, rather than refinancing with a new lender.

[45]  *See id.* at ¶¶ 34-36.

18

document.'" *See Williams v. CitiMortgage, Inc.*, 498 F. App'x. 532, 536 (6th Cir. 2012) (per curiam) (quoting *Nat'l Ass'n of Minority Contractors, Dayton Chapter v. Martinez*, 248 F. Supp. 2d 679, 681 (S.D. Ohio 2002)); *see also Croce v. New York Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019) (same).

Thus, the Court must "accept the facts as stated in" the Elemental Agreement, and those facts require the conclusion that if the Elemental Agreement transaction was a disguised loan, that loan was for more than $2.5 million. As a result, New York's criminal usury statute does not apply to the Elemental Agreement. Therefore it would be futile for the Plaintiff to amend its complaint to expressly state an objection to Elemental's claim based on the New York usury statute.

For these reasons, the Court must dismiss Count VII of the Plaintiff's Amended Complaint, with prejudice. And to the extent the declaratory judgment claim in Count VI is intended to support Count VII, it too must be dismissed, with prejudice.

### 2. Count VI and VIII

The declaratory judgment claim in Count VI of the Amended Complaint also is intended to support Count VIII. Count VIII alleges that if Michigan law applies to the Redstone Agreement and the Elemental Agreement, rather than New York law, then those agreements violate Michigan's usury law.[46] (This count is pled in the alternative to Count VII, which is based on New York's usury law.) If that is so, the Plaintiff alleges, then under Michigan law, "Redstone and Elemental are not entitled to collect from the Debtor anything over and above the

---

[46] *See* Amended Complaint (Docket # 15) at ¶¶ 149-151.

19

money actually disbursed to the [Plaintiff] under the Disquised Loan Agreements."[47]  Count VIII

seeks the following relief:

> judgment in favor of [the Plaintiff] finding that: (i) the Disguised
> Loan Agreements are usurious, (ii) Redstone and Elemental are
> prohibited from collecting from [the Plaintiff] any amount that
> exceeds the amount it disbursed to [the Plaintiff], and (iii) [the
> Plaintiff] is entitled to all its other remedies.[48]

The Defendants argue, among other things, that the Plaintiff's alternative claim of usury

under Michigan law in Count VIII is barred by Mich. Comp. Laws § 450.1275, which states, in

relevant part:

> A domestic or foreign corporation, . . . may by agreement in
> writing, and not otherwise, agree to pay a rate of interest in excess
> of the legal rate and the defense of usury shall be prohibited.

*See generally Kleanthous v. First of Chelsea Corp.*, 507 N.W. 2d 2, 3 (Mich. Ct. App. 1993).

The Court agrees with the Defendants, so Count VIII must be dismissed, with prejudice.

The Plaintiff's usury theory is that the Redstone Agreement and the Elemental Agreement

were disguised loan agreements, and that each agreement required the Plaintiff to pay disguised

interest, consisting of the difference between the "Purchase Price" (the amount advanced by the

MCA Creditor to the Plaintiff) and the "Purchased Amount of Future Receipts" (the total amount

the Plaintiff was to pay the MCA Creditor under the agreement).  Under the Plaintiff's usury

theory, that disguised interest was at a rate far greater than the rate allowed by Michigan usury

---

[47]  *Id.* at ¶ 154.

[48]  *Id.* at 29.

20

statutes.[49]

The Plaintiff is a corporation. *Under the Plaintiff's usury theory*, the Court must conclude that the Plaintiff agreed in writing with Redstone and Elemental "to pay a rate of interest in excess of the legal rate," within the meaning of § 450.1275. Under that statute, therefore, "the defense of usury" is "prohibited."

The Plaintiff's argument to the contrary is without merit. The Plaintiff argues that the Redstone Agreement and the Elemental Agreement each stated that the transaction was not a loan, and also that it stated that there was no interest. As discussed in Part D.1 of this Opinion, above, this argument ignores the Plaintiff's own usury theory. The Plaintiff's usury theory asks the Court to ignore the statements in the Redstone Agreement and the Elemental Agreement that the transaction was not a loan and that no interest was being charged. The Court must do that in order to entertain the Plaintiff's usury theory. If the transactions under these agreements were loans, and if they required the payment of interest, as the Plaintiff necessarily contends, then the defense under Mich. Comp. Laws § 450.1275 applies. Alternatively, if the transactions were not loans, or if they did not require the payment of interest, then the Plaintiff has no usury claim under Michigan law to begin with. Either way, Plaintiff's usury claim under Count VIII fails.

For these reasons, the Court must dismiss Count VIII, with prejudice. And to the extent the declaratory judgment claim in Count VI is intended to support Count VIII, it too must be dismissed, with prejudice.

### 3. Count VI as a stand-alone claim

---

[49] Neither the Plaintiff's Amended Complaint nor the Plaintiff's brief opposing the present Motion cites any particular Michigan usury statute that allegedly was violated.

The Defendants argue that if the Plaintiff's usury counts (Counts VII and VIII) are dismissed, then the declaratory judgment count (Count VI) also must be dismissed, because it is not a stand-alone cause of action. "The Declaratory Judgment Act [28 U.S.C. § 2201] is procedural in nature and 'does not create an independent cause of action' that can be invoked absent some showing of an articulated legal wrong." *Doe v. University of Dayton*, 766 F. App'x 275, 291 (6th Cir. 2019) (citation omitted); *see also Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (citation omitted) ("§ 2201 does not create an independent cause of action."); *see also Littler v. Ohio Ass'n. of Public School Employees*, 88 F.4th 1176, 1180 n.1 (6th Cir. 2023) (citations omitted) (explaining that "the Declaratory Judgment Act 'is only procedural, leaving substantive rights unchanged,'" and holding that the plaintiff's declaratory judgment request failed when her related substantive claim failed).

It is unclear to what extent the declaratory judgment claim in Count VI is meant to, or does, support counts of the Plaintiff's Amended Complaint other than the usury counts. The parties have not fully addressed this yet. For example, the Plaintiff argued in its brief that Count VI also supports Count I of the Amended Complaint.[50] The Defendants did not respond to that argument in their reply brief or during oral argument. So the Court will not dismiss Count VI in its entirety at this time. Rather, it will be dismissed only to the extent it is intended to support the two usury counts.

### 4. Count III (alter ego)

The Amended Complaint alleges that Redstone and Elemental each are Florida

---

[50]  *See* Pl's Resp. to Partial Mot. to Dismiss (Docket # 24) at 15.

corporations.[51]  But Count III of the Amended Complaint seeks "a judgment holding that Elemental and Redstone are alter egos," and asks the Court to "disregard their separate existence."[52]  For the reasons stated below, however, the Court concludes that Count III fails to state a claim upon which relief can be granted, and the Court will dismiss this count, without prejudice.

The Court agrees with the Defendants that the allegations in the Amended Complaint fail to state a plausible claim that would permit a finding that the Defendants are alter egos.

The Plaintiff's claim of alter ego, sometimes referred to as piercing the corporate veil, is not an independent cause of action under Michigan law.  As this Court has held in a previous opinion:

> Piercing the corporate veil is not an independent substantive cause of action under Michigan law.  Rather, it is a remedy used only for the benefit of third parties, and used only if the corporation has been found liable on some other independent claim. *Spartan Tube & Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prods. Co., Inc.*), 102 F.3d 223, 226 (6th Cir. 1996) (applying Michigan law) ("[A]n alter ego claim is not by itself a cause of action.").

*Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc.* (*In re Energy Conversion Devices, Inc.*), 621 B.R. 674, 733 (Bankr. E.D. Mich. 2020).  Even though alter ego is only a remedy and not a separate cause of action, courts allow an alter ego claim to stand if the underlying action survives.  *See id.* at 736; *GKN Driveline Newton LLC v. Stahl Specialty Co.*, No. 15-cv-14427, 2016 WL 1746012, at *5 (E.D. Mich. May 3, 2016) (internal quotation marks and citations omitted) ("Although plead as a separate claim," the court "construe[d] [the p]laintiff's [veil]

_____

[51]  Amended Complaint (Docket # 15) at ¶ 8.

[52]  *Id.* at 20.

piercing claim as a request for equitable relief based on [the p]laintiff's underlying breach of contract claim[.]").

This Court previously described the requirements a plaintiff must meet in seeking relief based on the alter ego doctrine:

> In *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. LTD*, 475 F.3d 783, 798 (6th Cir. 2008), the Sixth Circuit Court of Appeals, applying Michigan law, explained:
>
>> Under Michigan law, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (citing *Herman v. Mobile Homes Corp*., 317 Mich. 233, 26 N.W.2d 757, 761 (1947)). "This presumption, often called the 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Id*. (alteration in original) (quoting *Wells v. Firestone*, 421 Mich. 641, 364 N.W.2d 670, 674 (1984)). **Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss.** *Foodland Distribs. v. Al–Naimi*, 220 Mich. [Ct.] App. 453, 559 N.W.2d 379, 381 (1996) (citing *SDC Chem. Distribs., Inc. v. Medley*, 203 Mich. [Ct.] App. 374, 512 N.W.2d 86, 90 (1994)); *see also Gledhill v. Fisher & Co.*, 272 Mich. 353, 262 N.W. 371, 372 (1935).
>
> *Id.*; *see also Bodnar v. St. John Providence, Inc.*, No. 337615, 2019 WL 1049639, at *9 (Mich. Ct. App. Mar. 5, 2019) (same); *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 796 (E.D. Mich. 2014) (applying Michigan law) (same).

*Energy Conversion Devices Liquidation Trust,* 621 B.R. at 731-32 (emphasis added).

A requirement for alter ego relief, therefore, is that the corporate entity was "used to commit a fraud or wrong." It is also necessary to show that the "fraud or wrong" caused the plaintiff to suffer "an unjust loss." "[A] loss is not unjust if the complainant had full knowledge of the circumstances surrounding the owner's use of the entity and agreed to proceed despite that knowledge.'" *Id.* at 733 (quoting *Green v. Ziegelman*, 873 N.W.2d 794, 807-08 (Mich. Ct. App. 2015)).

The Plaintiff's Amended Complaint fails to plead facts that plausibly support these necessary elements of an alter ego claim. Count III alleges "fraud" and "fraudulent misrepresentations" by Elemental, Redstone, and their owner, Simon Isaacov,[53] but only in conclusory fashion:

> 105. Elemental and Redstone used their corporate entities interchangeably and **in order to perpetrate fraud** where (i) one of them offers money to a company in financial distress on usurious and unrealistic payment terms, (ii) when the company inevitably runs into difficulties meeting the financial obligations, they use threats, aggression **and fraudulent misrepresentations** to bully the company into signing a new agreement with the other entity where the amount the company owes is dramatically increased (in this case, more than doubled), and (iii) Elemental and Redstone don't give any consideration in exchange for entry into the new agreement and instead just move the (now greatly increased) debt from one of them to the other.

> 106. Elemental and Redstone used the same form of document as the basis of their Disguised Loan Agreements.

> 107. Mr. Isaacov interfaced with the Debtor on behalf of both Elemental and Redstone.

---

[53] The Plaintiff alleges that "[u]pon information and belief, Redstone and Elemental are owned or operated by Simon Isaacov ("Mr. Isaacov") or his family and close associates." Amended Complaint (Docket # 15) at ¶ 47.

108. Elemental and Redstone used the same physical address during the relevant time period.

109. Elemental and Redstone were used interchangeably without regard to their separate corporate structures, if any, **for the purpose of defrauding borrowers like the Debtor**.

110. Elemental and Redstone have such a unity of interest that their separate legal entities, if any, must be disregarded.[54]

The foregoing references to fraud are only "'legal conclusion[s] couched as a factual allegation,'" and as such, are insufficient, standing alone, to plausibly plead fraud. *See Wahrman v. Bajas* (*In re Bajas*), 443 B.R. 768, 771 (Bankr. E.D. Mich. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The United States Supreme Court cases now "'require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

For example, the legal conclusion in ¶ 105 that the Defendants used "fraudulent misrepresentations" is not supported by any facts alleged anywhere in the Amended Complaint. This omission is especially glaring given that under Fed. R. Civ. P. 9(b),[55] fraud must be pled with particularity: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Under this rule, a plaintiff alleging fraud must "'allege the time, place, and content of the alleged misrepresentation . . . the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Gold v. Winget*

---

[54] *Id.* at ¶¶ 105-110 (emphasis added).

[55] Civil Rule 9 applies in this adversary proceeding, under Fed. R. Bankr. P. 7009.

*(In re NM Holdings Co., LLC)*, 407 B.R. 232, 258 (Bankr. E.D. Mich. 2009) (quoting *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008)).

The Amended Complaint fails to allege any of these required particulars. For example, the Amended Complaint does not allege *any* particular misrepresentation, who made the misrepresentation, what exactly was stated, when it was stated, or how and where it was stated. And in the absence of any particular fraudulent representation, the facts alleged in ¶ 105 of the Amended Complaint, quoted above, do not sufficiently allege that any fraud occurred. Nor do the allegations in Count III sufficiently allege that any "wrong" was done by the Defendants' use of their two corporate forms.

In addition to the allegations in ¶¶ 105-110 of the Amended Complaint, the Plaintiff relies on the allegations in ¶¶ 27-30, which state the following about events that led to the Plaintiff making the Elemental Agreement with Elemental, to replace the Redstone Agreement:

> 27. Starting in November of 2023, the Debtor was low on cash and Redstone's daily withdrawals were being rejected for insufficient funds.
>
> 28. Despite the fact that Redstone had already received a substantial overpayment of its debt, it began harassing and threatening the Debtor's president, Scott Hirth, about the rejected withdrawals.
>
> 29. Redstone pressured Mr. Hirth via telephone, day and night, to pay additional amounts on the threat that Redstone would destroy the Debtor's business if the Debtor failed to comply.
>
> 30. The Debtor succumbed to the pressure and, on December 6, 2023, it entered into [the Elemental Agreement with Elemental] . . . .[56]

---

[56] Amended Complaint (Docket # 15) at ¶¶ 27-30.

These allegations, like the allegations in ¶ 105 that Redstone used "threats [and] aggression . . . to bully the [Plaintiff] into signing a new agreement with the other entity," do not show that the Defendants used their two corporate forms to commit a "fraud" or a wrong that would permit the use of the alter ego remedy. Rather, the allegations show, at most, a corporate creditor playing hardball with a corporate debtor that the creditor claimed had defaulted, and that was in financial difficulty.

The Amended Complaint shows that this corporate debtor was not an unsophisticated or small business. Rather, the Plaintiff was a retailer that had been in business for almost fifty years, and that sold merchandise from six locations and from a website.[57] The Plaintiff had enjoyed "decades of success" when it began to have financial distress in 2020. Even after that, (1) the Plaintiff agreed, as of June 14, 2023, in the Redstone Agreement, that its estimated average daily revenue was $42,857.14, and (2) the Plaintiff agreed, as of December 6, 2023, in the Elemental Agreement, that its estimated average daily revenue was $175,000.00.[58] And the Plaintiff's business was large enough that even after it filed bankruptcy in 2024, the Plaintiff's assets sold for $11.6 million.[59]

Similarly, the Plaintiff's confirmed liquidation plan shows that the Plaintiff is a relatively sophisticated debtor, with a complex liquidation plan, with six secured creditors whose claims

---

[57]  *See id.* at ¶¶ 9, 11-12.

[58]  As described in Part B.1 of this Opinion, in the Redstone Agreement, the daily payment amount of $35,000.00 was stated to be 35% of the Plaintiff's estimated average daily sales revenue; that equates to an average estimated total daily sales revenue of $42,857.14. As described in Part B.2 of this Opinion, in the Elemental Agreement, the daily payment amount of $70,000.00 was stated to be 40% of the Plaintiff's estimated average daily sales revenue; that equates to an average estimated total daily sales revenue of $175,000.00.

[59]  *See id.* at ¶¶ 14, 82.

total roughly $16.6 million; three MCA Creditors whose claims total roughly $5.8 million, priority tax claims from four states totaling roughly $91,000; and an estimated $31.6 million in non-priority unsecured claims.[60]  The claims register in the bankruptcy case shows a total of 113 claims filed.[61]

In addition, all of the facts alleged in ¶¶ 27-30 and 105-108 of the Amended Complaint, quoted above, are facts that the Plaintiff obviously knew, as shown by the Plaintiff's entering into the Redstone Agreement and the Elemental Agreement, and by the Plaintiff obviously knowing what those written agreements said.  As a result, Count III fails to plausibly allege the necessary element that the Plaintiff suffered "an unjust loss."  As noted above, a loss is not "unjust" in this context if "'the complainant had full knowledge of the circumstances surrounding the owner's use of the entity and agreed to proceed despite that knowledge.'"  *Energy Conversion Devices Liquidation Trust,* 621 B.R. at 733 (quoting *Green v. Ziegelman*, 873 N.W.2d 794, 807-08 (Mich. Ct. App. 2015)).

For these reasons, the alter ego claim in Count III of the Amended Complaint fails to state a claim upon which relief can be granted, and Count III must be dismissed.  The Court will dismiss that count without prejudice.[62]

## E.  Conclusion and Order

---

[60]  *See* Plan (Docket # 275 in Case No. 24-47922) at 8 (chart), 24 § 2.2, 36 § 3.12.

[61]  *See* Claims Register, Case No. 24-47922.

[62]  This alter ego count will be dismissed without prejudice at this time, rather than with prejudice, to leave open the possibility that the Plaintiff might seek to use the alter ego doctrine in the future.  During oral argument, for example, the Defendants' attorney suggested that if and when the Plaintiff obtains a judgment against Elemental, the Plaintiff might seek to hold Redstone liable as well, based on the alter ego doctrine.

For the reasons stated above, the Court now enters the following Order.

IT IS ORDERED that the Motion (Docket # 22) is granted in part, and denied in part, as provided in this Order below.

IT IS FURTHER ORDERED that:

1.  Count VII of the Plaintiff's Amended Complaint (Docket # 15, the "Amended Complaint") (usury under New York law) is dismissed, as to both Elemental Capital, Inc. and Redstone Advance, Inc., with prejudice.

2.  Count VIII of the Plaintiff's Amended Complaint (usury under Michigan law) is dismissed, as to both Elemental Capital, Inc. and Redstone Advance, Inc., with prejudice.

3.  Count III of the Amended Complaint (alter ego) is dismissed as to both Elemental Capital, Inc. and Redstone Advance, Inc., each without prejudice.

4.  The Defendants' joint request for dismissal of Count VI of the Amended Complaint (declaratory judgment) is denied, except that Count VI is dismissed, as to both Elemental Capital, Inc. and Redstone Advance, Inc., with prejudice, to the extent Count VI is intended to support Counts VII and VIII of the Amended Complaint.

**Signed on January 20, 2026**



/s/ **Thomas J. Tucker**

**Thomas J. Tucker**
**United States Bankruptcy Judge**